## Sallie Wallace v. The State.

1. Infanticide. — If a woman, with a sedate and deliberate mind, before or after the birth of her child formed the design to take its life, and after the parturition was complete and the child born alive and in existence she executed her design and took its life, it was murder with express malice and in the first degree.

2. Same. — But if the design to take the life of her child was formed and executed when her mind, by physicial or mental anguish, was incapable of cool reflection, and when she had not the ability to consider and contemplate the consequences of the fatal deed, and she conceived and perpetrated it under a sudden, rash impulse after the child had been wholly produced from her body and while it had existence, the crime was murder in the second degree.

3. Same — Charge of the Court. — If in a case of this character the jury might have concluded from the evidence that the defendant took her infant's life before its birth was complete, or that she caused its death by means which she used merely to assist her delivery, it was incumbent on the court to instruct for acquittal in the event the jury should so find.

Appeal from the District Court of McLennan.    Tried below before the Hon. L. C. Alexander.

The indictment charged that the appellant, on March 21, 1879, and immediately after the birth of her female infant, strangled it to death by tying a string around its throat.

About sunset on the day prior to the infanticide, the defendant, a negress, came to the house of Cæsar Williams, a negro who lived about six miles south of Waco in McLennan County. Neither he nor his wife knew the defendant, but she was given a bed and stayed all night with them. The indications of her pregnant condition were observed. The next morning she got up and left the house, but returned in about half an hour, joined the family at breakfast, and afterwards went with her hostess to the cow-pen. After remaining there a little while, and complaining that she was sick, she went down to a branch about a hundred yards from the house. Cæsar's wife returned to the house from the cow-pen, and in about half an hour observed the defendant's head above the brush and bushes near the

branch.    About  eight  o'clock  the  same  morning,  she  was
seen  on  her  way  to  her  mother's,  some  four  or  five  miles
distant.

The  next  day · Cæsar's  wife  and  another  negro  woman
found  the  corpse  of  a  new-born  infant  near  the  branch
where  the  defendant  was  seen  the  preceding · morning.    A
domestic  string  was  wound  twice  around  its  neck,  and  tied
in  a  hard  knot  behind.    The  child  was  full-sized,  with  devel-
oped  limbs  and  nails  and  a  full  head  of  hair.    Near  by  was
found  an  apron  worn  by  the  defendant  when  she  came  to
Cæsar's.

A  physician  who  at  the  instance  of  the  coroner  made  an
examination  of  the  corpse  described  the  indications  upon
which  he  based  his  professional  opinion  that  the  child  had
been  born  alive  and  that  it  was  strangled  to  death  by
the  string,  which  he  said  was  tied  tight  enough  to  have
strangled  a  grown  person.    He  observed  no  swelling  of  the
face  or  head.

Another  physician,  testifying  for  the  defence,  said  that
the  signs  of  strangulation  were  swelling  of  the  head  and
face,  and  that  an  absence  of  these  signs  would  indicate  that
some  other  cause  than  strangulation  occasioned  the  death.
He  further  stated  that  there  is  no  test  enabling  a  medical
expert  to  affirm  that  a  dead  infant  had  or  had  not  been
born  alive. ` The  utmost  ascertainable  from  *post-mortem*
observation  is  that  the  lungs  had  been  distended  with  air
either  before  or  after  birth,  and  by  either  a  natural  or  an
artificial  process.

C.  Stubblefield,  for  the  defence,  testified  that,  about  a
week  before  the  child  was  found,  the  defendant,  who  had
been  in  his  employ,  informed  him  that  he  would  have· to
get  another  servant,  as  she  was  pregnant  and  would  soon
be  confined,  and  wanted  to  go  to  her  mother's  for  that  pur-
pose.    He  further  testified  that  he  was  aroused  by  the
defendant  before  day  on  the  19th  of  March,  who  took  him
to  her  room,  where  another  negro  woman  also  slept.    This

other negress was subject to fits, and was in great pain, going through all manner of contortions. Witness quieted her and returned to his bed, but was soon awakened by cries of the defendant. Going again to her room, he found her greatly excited, and engaged in a violent struggle with the other woman, who was in another fit. The defendant was greatly frightened, and was exerting every effort to get loose from the grasp of the other woman. Witness finally released her, and she ran out of the door and fell down a flight of four steps to the ground. She left his employ the same evening. She had never attempted to conceal her pregnancy from him.

The jury found the defendant guilty of murder in the second degree, and assessed five years in the penitentiary.

*Williams & Inge*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

Clark, J.    If the defendant, with a sedate and deliberate mind, anterior or subsequent to the act of parturition conceived the design to take the life of her new-born infant, and in pursuance of such formed design did take its life in the manner alleged in the indictment, and such infant was wholly produced from the body of its mother alive, and was in existence by actual birth at the time the injuries causing death were inflicted, then she would be guilty of murder with express malice. If, however, the design to take its life was formed and executed when her mind, by reason of physical or mental anguish, was incapable of cool reflection, and she was not sufficiently self-possessed to consider and contemplate the consequences about to be done, but, yielding to a sudden, rash impulse, she conceived and perpetrated the fatal deed after the infant had been wholly produced from her body and had an existence by actual birth, then she was guilty of murder in the second degree.

We cannot say that the charge of the learned judge who presided on the trial below submitted these issues with that accuracy which usually characterizes his instructions; nor do we feel an assurance that the jury may not have been misled by the general terms employed in defining the ingredients especially of murder in the second degree. Abstractly considered, the definition may not be inaccurate in ordinary cases, but in this case the better practice would have been to have submitted that issue substantially as above indicated. In this particular case, it is not well conceived how any legal provocation, excuse, or justification could arise, if the defendant strangled her own child after birth; and the instruction was practically tantamount to an announcement that the defendant was guilty of murder in the second degree if she voluntarily and intentionally killed the child by the manner and means alleged.

We are also of opinion that the charge is materially defective in another respect. The issue of strangulation before birth was not submitted to the jury. It is true that among other definitions the jury were told that "in order that a child be in existence by actual birth, the parturition must be complete, and the body of the child must be expelled from the mother, and it must be alive; so that the destruction of vitality in a child before it is completely born is not murder, under whatever circumstances committed." But after applying the law to the particular case with reference to murder in the two degrees, it was incumbent upon the court to do likewise with reference to that phase of the evidence which might tend to the exoneration of the defendant. Presented in the form of an abstract proposition, it was not brought to the attention of the jury with that distinctness which the law demands. If they believed from the evidence that the defendant took the life of the deceased, by the means and in the manner alleged, yet the same was done before the child was completely born, or if they believed from the evidence that the means

used, and which resulted in death, were merely for the purpose of assisting delivery, in either event they should acquit.

. The instructions asked on circumstantial evidence should also have been given. *Harrison* v. *The State*, 6 Texas Ct. App. 42; *Hunt* v. *The State, ante*, p. 212.

The judgment is reversed and the cause remanded.
*Reversed and remanded.*